```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
                          NORTHERN DIVISION
                           AT COVINGTON
```

**CIVIL ACTION NO. 2009-160-WOB**

SAMANTHA McDONALD                                         PLAINTIFF

VS.                 <u>MEMORANDUM OPINION AND ORDER</u>

**CITY OF FORT MITCHELL,
KENTUCKY, ET AL.**                                        DEFENDANTS

This is a civil rights action in which plaintiff alleges that defendants violated her constitutional rights by arresting her for custodial interference.

This matter is before the Court on the motion for summary judgment by defendants the City of Ft. Mitchell, Kentucky and Officer William Zerhusen. (Doc. 46).

The Court heard oral argument on this motion on Wednesday, March 28, 2012. Tom Ammann and Roger Walk represented the plaintiff, and Jeff Mando represented the defendants. Official court reporter Joan Averdick recorded the proceedings.

Having heard the parties, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

**A.   McDonald Sends her Children to Stay in Florida**

During the week of July 21, 2008, plaintiff Samantha McDonald ("McDonald") spoke to a friend, Crystal Drouillard ("Drouillard"), who lived in Florida and who plaintiff referred to as her "sister" because Drouillard had been a foster child in McDonald's home from approximately 1989 to 1993. (McDonald Depo. 76-79, 86-87). McDonald's mother suggested that McDonald's four children travel to Florida to visit Drouillard for a week before starting school. (*Id.*) McDonald agreed, as she had just moved and thought she could use the time to get organized in her new home.

On July 26, 2008, McDonald drove her children to Drouillard's home in Naples, Florida, left the children there, and returned to Kentucky. (McDonald Depo. 91-95). During the week of July 28, Drouillard called McDonald and asked if the children could stay with her for another week, and McDonald agreed.

While the children were staying with Drouillard, she claimed that McDonald's estranged husband, the father of three of the children, called her and threatened to harm her and the children. (Doc. 47 at 5). Drouillard then contacted the Florida Department of Children and Families ("FDCF") and informed the agency of the situation.

On July 31, 2008, the FDCF took the McDonald children into protective custody and filed a Verified Dependency Shelter Petition based on information given to them by the Drouillards. On August 1, 2008, the State of Florida held a shelter hearing at which Drouillard stated that McDonald had abandoned the children. (Doc. 47-1 at 3). The petition indicates that the FDCF contacted a grandmother of the children and told her to notify McDonald of the situation. (Doc. 47-1 at 2).

The Collier County Circuit Court then placed custody of the children in the FDCF, which in turn placed them with the Drouillards. (Doc. 47-1).

On August 7 or 8, 2008, McDonald called Drouillard and told her that she would be coming to Florida to pick up her children because they were scheduled to start school soon. When McDonald arrived in Florida, Drouillard told her of the threats by McDonald's estranged husband, but she did not tell McDonald of the involvement of the FDCF. (McDonald Depo. 107-15). McDonald returned to Kentucky with the children.

On or about August 25, 2008, the Drouillards contacted the FDCF and told them that McDonald had taken the children from the Drouillard home three days earlier. (Doc. 47 at 5).

**B. The Events of September 5, 2008**

On September 5, 2008, the FDCF requested a "pickup" order for McDonald's children from the Collier County Juvenile Court. The Court entered that order at 11:47 a.m. (MSJ Exh. 3).

Meanwhile, a deputy from the Collier County Sheriff's Department in Naples, Florida contacted Erlanger dispatch[1] and informed them that four children in the custody of the Florida courts were believed to be at an address in Ft. Mitchell. (Doc. 47-3 at 1) (Transcript of Erlanger Dispatch). This deputy stated that she had spoken to the children's mother the night before, that the mother had "given [her] a bunch of crap," and that that the mother was hiding the children and would not let them go willingly. (*Id.* at 2).

McDonald denies that she spoke to anyone from Florida law enforcement prior to September 5, 2008. (McDonald Affidavit ¶ 1). She also denies that she knew that the State of Florida had taken custody of her children. (*Id.*).

Earlier that same day, at approximately 7:30 a.m., defendant William Zerhusen ("Zerhusen"), a Ft. Mitchell

---

[1] The Erlanger, Kentucky police dispatch also handles dispatch for the City of Ft. Mitchell.

police officer, received a call from dispatch stating that a citizen had reported concerns that children at a nearby home were not in school. (Zerhusen Depo. 49-53). Zerhusen responded to the call and went to the reported address.

A babysitter answered the door, and Zerhusen asked to speak to the parents. (Zerhusen Depo. 59). McDonald then came to the door and Zerhusen explained why he was there. McDonald stated that she was trying to get her children enrolled in school but that she still needed immunization paperwork. (Zerhusen Depo. 60). Zerhusen told her to get the paperwork as soon as possible, and he said that he would have a school resource officer follow up to make sure that the children were in school. (*Id.*). Zerhusen then left.

Shortly thereafter, Zerhusen received another call from dispatch. Dispatch informed Zerhusen that they had received a call from the Collier County, Florida Sheriff's office who stated that the children at the McDonald residence had been reported as missing from Florida. (Zerhusen Depo. 63). The Ft. Mitchell police confirmed that the children were listed as missing in the National Crime Information Center ("NCIC") database. (Bussman Depo. 50-51, 63).

5

Zerhusen then contacted Officer Brian Hager and asked him to meet Zerhusen at the McDonald residence. (Zerhusen Depo. 68). The officers approached the home, knocked on the door, and were advised by a babysitter that McDonald was not there. (Zerhusen Depo. 70-71). Zerhusen asked the babysitter, who came out onto the porch, if he would call McDonald and ask her to return so that they could discuss her children. The babysitter did so and informed the officers that McDonald was on her way back to the house. (Zerhusen Depo. 73). Thereafter, the children also came out onto the front porch. (Zerhusen Depo. 74-75).[2]

Zerhusen then walked back to his cruiser and called dispatch to verify that the names and dates of birth were those of the children reported missing from Florida. (Zerhusen Depo. 77-78). Dispatch responded that these were indeed the children reported as missing. (Zerhusen Depo. 80). Zerhusen then asked dispatch to call the Kentucky Cabinet for Health and Family Services ("CHFS"). (Zerhusen Depo. 80-86).

Thereafter, Zerhusen spoke to Jennifer Pinkston ("Pinkston") and Kendra Kilgore ("Kilgore") of the CHFS. Zerhusen told Kilgore that he had a "pickup" order for

---

[2] At some point, Zerhusen verified the names and birth dates of the children at the home. Zerhusen could not recall if it was on his first or second call to the home.

6

McDonald's children and that they were listed in the NCIC database as missing from Florida. (Kilgore Depo. 93).

Kilgore then contacted the FDCF in Florida and verified that the children were missing from that state's custody. (Kilgore Depo. 44, 52-55, 75). The Florida agency faxed Kilgore some information regarding the children and told her that they would be taking the children back. (Kilgore Depo. 86, 97-98). Kilgore instructed Pinkston and another CHFS worker, Angie Niesen ("Niesen"), to prepare an Emergency Custody Order and Dependency Petition requesting temporary custody in the CHFS until Florida officials could arrive to get the children. (Kilgore Depo. 88-91; Niesen Depo. 17). Niesen presented the petition to Kenton County Family Judge Christopher Mehling, who granted the order. (Niesen Depo. 17-18).

Zerhusen testified that, once they confirmed that the children were indeed missing from Florida, they waited for officials from the CHFS to arrive because the children could not be left with anyone else. (Zerhusen Depo. 103, 107).

Around this time, Captain James Bussman ("Bussman") and Detective Timothy Berwanger ("Berwanger") also arrived at the McDonald home. (Zerhusen Depo. 84-85).

7

At some point, Zerhusen and Berwanger spoke by phone to the deputy from the Collier County Sheriff's Department, who again advised that the children were supposed to be in the custody of the State of Florida. (Zerhusen Depo. 112; Berwanger Depo. 22-23, 46).

Approximately an hour after Zerhusen and Hager arrived at the home, McDonald's boyfriend, Timothy Mills, also arrived. (Zerhusen Depo. 87-88). Officer Hager ran Mills's driver's license and learned that Mills was operating the vehicle with a suspended license. Hager placed Mills under arrest and took him to the Kenton County Detention Center. (Zerhusen Depo. 93-96).

Thereafter, McDonald returned. One of the officers told McDonald that they were waiting for the CHFS, and Zerhusen told her they were taking her children. (McDonald Depo. 158-59). McDonald told Zerhusen that her kids were "not going with strangers" and that "If anybody tries to take my children from me, you're going to have to have – need more people here than just you." (McDonald Depo. 158-59).

After the officers consulted with the Kenton County Attorney's Office, Zerhusen placed McDonald under arrest for custodial interference. McDonald alleges that, while placing her under arrest, Zerhusen yelled that she was

8

going to jail for four counts of "kidnapping." (McDonald Depo. 159-60).

At some point during these events, Niesen and Pinkston from the CHFS arrived and took the children into their custody. (Niesen Depo. 26; Pinkston Depo. 46).

### C. Subsequent Events

On or about September 7, 2008, Kelly Santana, an employee of FPSF, picked up McDonald's children in Kentucky and transported them back to Florida, where they remained until April 5, 2009. During that time, the children resided in a shelter and foster homes.

In late March 2009, Jessica Goodall, an employee of FPSF, traveled to Kentucky and performed an inspection of McDonald's home. On or about April 5, 2009, Goodall flew with McDonald's children from Florida to Kentucky where they were reunited with their mother.

### D. Litigation Ensues

McDonald filed an action in the Kenton Circuit Court on September 8, 2009, and defendants removed the case to this Court. (Doc. 1)

In her Second Amended Complaint, McDonald alleges various claims: (1) violation of 42 U.S.C. § 1983 for

various constitutional violations[1]; (2) false arrest and imprisonment, illegal search, malicious prosecution, assault and battery, defamation and false light invasion of privacy against Officer Zerhusen; (3) negligent hiring, supervision, and training against the City of Fort Mitchell; (4) the tort of outrage; (5) abuse of process against all defendants; and (6) negligence and gross negligence. (Doc. 8).

Plaintiff originally named as defendants two Florida agencies and two of their employees, as well as the City of Ft. Mitchell and Officer Zerhusen. On February 4, 2011, however, plaintiff voluntarily dismissed the Florida defendants. (Doc. 35).

Defendants the City of Ft. Mitchell and Officer Zerhusen thereafter filed the instant motion for summary judgment.

---

[1] The alleged underlying constitutional violations are violation of due process, equal protection, privileges and immunities, illegal seizure of her person, illegal detention, deprivation of the protection of the sanctity of the family, and right to privacy.

*Analysis*

**A.   False Arrest**

"In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009) (quotation omitted). "A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Id.*

In determining whether an officer had probable cause to make an arrest, the court examines the totality of the circumstances and may consider only the information possessed by the arresting officer at the time of the arrest. *Id.* (citation omitted). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that it required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.* at 499.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* (citation omitted). But under § 1983, "an arresting agent is entitled to qualified immunity if he or she could

11

reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Id.*

Zerhusen arrested plaintiff for violation of KRS 509.060, "Custodial interference." This statute states, in pertinent part:

> A person is guilty of custodial interference when, knowing that he has no legal right to do so, he takes, entices or keeps from lawful custody any mentally disabled or other person entrusted by authority of law to the custody of another person or to an institution.

KRS 509.070(1).

Zerhusen is entitled to qualified immunity because a reasonable officer could have believed that probable cause existed for plaintiff's arrest for this offense.

It is undisputed that Zerhusen was informed numerous times by dispatch, and later directly by the Collier County Sheriff's Department, that McDonald's children were missing from the custody of the State of Florida, and that they were listed as such in the NCIS database. Whether the children were rightly or wrongly in the custody of the State of Florida is immaterial to what Zerhusen knew and whether his actions were reasonable. Nor is that issue before this Court.

Acting within his authority, Zerhusen therefore took the necessary steps to secure custody of the children, and those steps were objectively reasonable. When Zerhusen informed plaintiff that the police were there to secure custody of the children until the CHFS officials arrived, it is undisputed that plaintiff stated that she would not permit her children to leave. Plaintiff testified:

> Q. What happened next?
>
> A. I just ran out of my dad's truck and started coming up to the steps just asking what is going on? . . . And I remember an officer telling me something about family, that family –
>
> Q. Cabinet for Family and Children?
>
> A. They couldn't really leave until they got there for my kids. So I just know it was serious, but I still don't know what's going on. **And I heard him say that, and I said what do you mean my kids? Nobody's taking my kids anywhere.** And my dad even told them, well, I can – the kids can come with me until we find out what's going on. They told my dad no. **And I said, well, my kids are not going with strangers, they're not going anywhere.** And I remember Officer William [Zerhusen] smiling in my face, saying, well, we're taking your kids. **And I said, my exact words was, "If anybody tries to take my children from me, you're going to have to have – need more people here than just you." And that was my exact words to him.**

(McDonald Depo. 157-59) (emphasis added).

It was after this exchange that the Zerhusen placed plaintiff under arrest.

Thus, at the time Zerhusen arrested plaintiff he knew the above facts regarding the status of the children, as

13

well as the fact that plaintiff had stated that she intended to prevent him from carrying out his lawful authority to take the children into custody.  Given the above sequence of events, it was also reasonable for Zerhusen to believe that plaintiff had knowingly removed the children from Florida in contravention of that state's custody.  Thus, under the totality of the circumstances, it was reasonable for Zerhusen to believe that he had probable cause to arrest plaintiff for the above offense.  These undisputed facts entitle Zerhusen to qualified immunity.

    Plaintiff makes much of the fact that the "pickup" order from Florida was not time-stamped until later in the morning after she was arrested.  This is immaterial.  As discussed, the above undisputed facts regarding what Zerhusen was told and what he confirmed through numerous official channels regarding the status of the children gave him an objectively reasonable basis for acting as he did. That the actual written "pickup" order was not entered until later in the morning does not change the fact that the FDCF had officially reported the McDonald children missing, and that their status was entered into the NCIS system, reported to the Collier County Sheriff's Department, and then reported to the Ft. Mitchell police. This argument is simply a red herring.

### B. Other Alleged Constitutional Violations

Plaintiff also alleges that defendants violated other constitutional rights, including illegal search, due process, equal protection, and violation of the fundamental right of parents to make decisions regarding their children. These claims cannot survive summary judgment.

As defendants correctly note, plaintiff's allegation of a due process violation based on the same facts as her false arrest claim cannot state a viable claim independent of her Fourth Amendment claim. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 313 (6th Cir. 2005).

Plaintiff also has raised no triable issue as to a violation of her equal protection rights because she does not allege that she was treated differently based on membership in a suspect class or that she was treated differently from others similarly situated without any rational basis. *See id.* at 312. Indeed, plaintiff's memorandum in opposition is silent as to this claim.

Plaintiff also asserts that her fundamental right to the care and custody of her children was violated. However, the record is undisputed that Zerhusen and the City were not involved in the CHFS's decision to seek the Emergency Custody Order from Kenton County, which resulted in the removal of the children and their return to Florida.

15

Nor was Zerhusen or the City involved in any subsequent proceedings which prolonged the time that plaintiff's children remained in Florida. Whatever process plaintiff may have been due with respect to the custody of her children was not within the control of these defendants.[3]

Finally, plaintiff asserts in a conclusory fashion that her Fourth Amendment rights were violated by an illegal search of her home, but there is no evidence that Officer Zerhusen ever entered her home. Plaintiff does not offer any substantive defense of this claim in her brief.

Plaintiff thus has raised no triable issue of fact on her § 1983 claims.

### C.   The City of Ft. Mitchell

While plaintiff alleges a municipal liability claim against the City, she has come forward with no evidence from which a reasonable fact finder could conclude that the City's policies, training, or supervision were inadequate.

Summary judgment is appropriate on this claim as well.

---

[3] To the extent that plaintiff's allegations could be read as asserting a substantive due process claim based on the right to familial association, the allegations against these defendants do not come close to the applicable "shocks the conscience" standard. *See Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011).

16

**D.   State Law Claims**

Because the Court has determined that defendants are entitled to summary judgment on plaintiff's federal claims, the Court will exercise its discretion to remand plaintiff's state law claims to the Kenton Circuit Court. *See Long v. Bando Mfg. of America, Inc.*, 201 F.3d 754, 761 (6th Cir. 2000) (holding that district court has discretion to remand rather than dismiss state law claims after dismissal of all federal claims).

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. 46) be, and is hereby, **GRANTED** as to plaintiff's federal claims.  Plaintiff's state law claims be, and are hereby, **REMANDED TO KENTON CIRCUIT COURT**.  A separate judgment shall enter concurrently herewith.

This 5th day of April, 2012.



Signed By:
William O. Bertelsman
United States District Judge

TIC: 58 min.